**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF D.N.L.H., MINOR CHILD | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 865 WDA 2022 |

Appeal from the Order Entered March 14, 2022
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  021-2021

BEFORE:   BOWES, J., OLSON, J., and COLINS, J.[*]

MEMORANDUM BY OLSON, J.:                    **FILED: JANUARY 27, 2023**

Appellant, R.H. ("Father"), appeals from the order entered on March 14, 2022 granting a petition filed by D.L. ("Mother") to involuntarily terminate Father's parental rights to his son, D.N.L.H. ("Child") pursuant to 23 Pa.C.S.A. §§ 2511(a)(1) and 2511(b).  We affirm.

The trial court set forth the relevant facts of this case:

[…] Child [was born] [i]n August [], 2012.  Following [] Child's birth, Mother and Father began a co-parenting relationship with [] Child, during which Father would occasionally stay with Mother and perform parental duties on behalf of [] Child.  The extended family contacts for [] Child include Father's own mother [] (hereinafter "Grandmother"), who passed away after appearing to provide testimony in this matter.  While [] Child was still at a very young age, Mother entered a job training program called "job corps," which required her to reside separately from [] Child for a period of between six and nine months.  During this time, Mother signed paperwork directing that the public assistance she received

---

[*] Retired Senior Judge assigned to the Superior Court.

on behalf of [] Child be transferred to Grandmother. Father continued to maintain the same level of contact with [] Child during this time period.

Following Mother's return from the job corps program, Father became incarcerated [] around 2015. While incarcerated, Father lost contact with Mother, and by extension, [] Child. Upon his release, Father indicated that he attempted to see [] Child each day until Mother filed a Protection from Abuse (PFA) [p]etition against him. After a final PFA order was entered in January 2018, Father testified that he no longer had contact with [] Child out of an abundance of caution because he did not want to be accused of violating the PFA order. The PFA order did not include any specific custody terms, but only indicated that the parties were to abide by the terms of their current custody order, and that Father could modify those terms by petitioning the custody court. Mother [] married [another man ("Stepfather")] in September 2020. The PFA [order] expired in January of 2021, and shortly thereafter, [on February 19, 2021,] Mother petitioned [the trial c]ourt to terminate Father's parental rights [so that, ultimately, Stepfather could adopt Child].

Trial Court Opinion, 8/18/2022, at 2-3. "The hearing on Mother's [p]etition spanned several days, first taking place on July 22, 2021, then on October 13, 2021, and finally concluding after testimony was taken on February 22, 2022." *Id.* at 1. At each hearing, Mother and Father were represented by counsel. *Id.* The trial court also appointed both an attorney to represent Child's legal interests and a separate guardian *ad litem* who were both present for all three hearings. *Id.* On March 14, 2022, the trial court granted Mother's petition and involuntarily terminated Father's parental rights. This timely appeal resulted.[1]

_____

[1] Due to a breakdown in the judicial system, Father was not properly served with the trial court order. As a result, the trial court granted Father additional time to file a notice of appeal. On July 15, 2022, Father filed a timely notice
*(Footnote Continued Next Page)*

On appeal, Father presents the following issues for our review:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1) where [F]ather, based on all available resources and ability, exercised reasonable firmness in resisting obstacles placed in his path and maintaining a relationship with [Child]?

2. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(b) where the evidence indicated the lack of integrity of the proposed adoption and the unlikelihood that the proposed adoption would occur[?]

3. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(b) where [Mother] failed to prove by clear and convincing evidence that severing the parent-child bond would not have a detrimental effect on [Child] and would best serve the developmental, physical and emotional needs and welfare of [Child ?]

Father's Brief at 4-5.

In his first issue presented, Father claims that the trial court erred by involuntarily terminating his parental rights under Section 2511(a) because "[M]other actively prevented contact between [F]ather and [Child]." *Id.* at 19. Father claims that he did not understand the terms of the PFA order and/or the custody order that Mother subsequently obtained. *Id.* at 20. Further, Father asserts that, following the issuance of the PFA order, Mother

---

of appeal, and a corresponding concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on August 18, 2022.

moved, did not disclose her new address to Father, and blocked Father and paternal relatives on social media. *Id.* at 20-21. Finally, Father contends that due to his "limited cognitive abilities and scarce financial resources, it was impossible for [F]ather to overcome the barriers to contact erected by [M]other." *Id.* at 23. Father asserts that his status as a resident of Allegheny County foreclosed his efforts to secure *pro bono* legal services in Westmoreland County. *Id.* at 24. Father also maintains that his cognitive impairments prevented him from handling this matter *pro se*, since he lacked academic and computer skills needed to pursue litigation. *Id.* at 24-25.

We review involuntary termination orders for an abuse of discretion, which requires an error of law or a showing of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *See In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021) (citation omitted). In applying this standard, appellate courts must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021); *see also In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021).

Pennsylvania's Adoption Act governs involuntary termination of parental rights proceedings. *See* 23 Pa.C.S.A. §§ 2101-2938. Section 2511(a) provides grounds for involuntary termination of parental rights. If the trial court finds clear and convincing evidence supporting the existence of one of the grounds for termination set forth in subsection (a), the court must then

consider whether termination would best serve the child under subsection (b).

*Id.* § 2511(b).

Initially, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), which provides, in pertinent part:

> **(a) General rule**.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. § 2511(a)(1).

Our Supreme Court has stated:

> Appellate review in cases involving involuntary termination of parental rights is limited to determining whether the trial court's determination is supported by competent evidence. When applying this standard of review, an appellate court must accept the findings of fact and credibility determinations of the trial court if they are supported by evidence of record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion. An abuse of discretion is found where there is a demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. It matters not that an appellate court might have reached a different conclusion, as it is well-established that absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand.
>
> Parents enjoy a fundamental right to make decisions regarding the care, custody and control of their children. It cannot be denied that significant and permanent consequences for both the parent and child can follow the termination of parental rights, as there is an undeniable importance in a child's relationship with a biological

- 5 -

parent. In recognition of the gravity attendant to the termination of parental rights, the moving party must establish the statutory grounds by clear and convincing evidence; that is, evidence that is so clear, direct, weighty and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

To terminate parental rights under Section 2511(a)(1), the party seeking termination must prove that the parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties. Parental duties are not defined in the Adoption Act, but our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life. Fortitude is required, as a parent must act with reasonable firmness to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities. Of importance is the General Assembly's emphasis in Section 2511(a)(1) on the six months immediately preceding the filing of the termination petition when evaluating a parent's conduct. Although courts are to avoid the mechanical application of the Adoption Act, we may not ignore that the General Assembly has drawn focus to the six months immediately preceding the filing of the termination petition. Indeed, [our Supreme] Court addressed this aspect of Section 2511(a)(1) and reaffirmed that for an analysis thereunder, the most critical period for evaluation is the six months immediately preceding the filing of the termination petition.

When considering a request to terminate rights under Section 2511(a)(1), a parent's failure or refusal to perform parental duties must be analyzed in relation to the particular circumstances of the case. [Our Supreme Court] has explained that:

> a finding of abandonment, which has been characterized as one of the most severe steps the court can take, will not be predicated upon parental conduct which is reasonably

- 6 -

explained or which resulted from circumstances beyond the parent's control. It may only result when a parent has failed to utilize all available resources to preserve the parental relationship.

Decades ago, [our Supreme] Court clarified that a parent's efforts are always considered in light of existing circumstances. Thus, the focus of the inquiry is on whether, under the circumstances, the parent has acted with reasonable firmness in refusing to yield to the obstacles that have prevented the performance of parental duties.

To that end, even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months as required by Section 2511(a)(1), the court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights. Consideration of the totality of the circumstances includes evaluation of the following: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b). [To] reiterate [] the purpose of this analysis is to give effect to [the] mandate that courts avoid a mechanical application of the law regarding the termination of parental rights. The law must be applied with the purpose of serving the needs and welfare of each individual child in his or her particular circumstances. It is within this framework that a court determines whether a parent has faced barriers that prevented the parent from maintaining the parent-child relationship. What constitutes a barrier in the context of a Section 2511(a)(1) analysis is a finding within the discretion of the trial court, and what may constitute a barrier necessarily will vary with the circumstances of each case. In some instances, obstructive behavior by the child's custodian presents a barrier to the parent's ability to perform parental duties, which mitigates the parent's failure to maintain the parent-child relationship. In other instances, trial courts have found substance abuse, mental health issues, homelessness, joblessness, criminal charges, or a confluence of some or all of these issues created barriers to the maintenance of the parent-child relationship. In all instances, the trial court consider[s] the explanation offered by the parent when deciding whether termination of parental rights was warranted.

*In re Adoption of L.A.K.*, 265 A.3d at 591–593 (Pa. 2021) (internal citations, quotations, and original brackets omitted).

Here, in involuntarily terminating Father's parental rights under Section 2511(a)(1), the trial court opined:

The evidence presented [] indicated that [] Child had not seen Father since some time in 2017,[2] prior to Mother obtaining a three-year [PFA] order against him on January 24, 2018. The consent order entered on the PFA specifically states that the parties are to follow the current custody order and that, if Father wishes to modify the terms of the custody order, he was to utilize the court system. Father discontinued any contact with [] Child from that point forward.

Father's argument on this point is that Father did everything in his power to maintain a relationship with [] Child but was stone-walled by Mother, thus, the fact that he had not maintained contact with [] Child or performed parental duties should not be held against him. Father testified extensively as to his learning disabilities creating difficulty for him to read and comprehend the various court orders pertaining to the custody of [] Child, but Father also indicated that he and [Grandmother] with whom [] Child resided on a temporary basis, were previously afforded some type of custody while Mother participated in her job corps program. He testified as to his reliance on family members and paramours to keep him informed, especially after Mother obtained a PFA against him. He also testified that neither the Allegheny County court staff nor anyone in his personal life explained the terms of the PFA order and whether it had an impact on his custodial rights. He stated that he was unaware of where Mother resided after the PFA was entered, but this is not uncommon in custody matters involving instances of abuse. Mother also testified that she blocked Father on social media platforms because she did not want him to have contact with her while the PFA was in effect.

_____

[2] We reiterate that Child was born in August, 2012. As such, Child was approximately five years old the last time Father saw him.

- 8 -

> The closest that Father came to taking any action on his own was to ask Mother's brother and other people in his social circle if they could speak to Mother and ask permission for Father to resume having contact with [] Child. While this may be considered minimal effort by Father, the notion that Father did everything in his power to overcome Mother's efforts to keep [C]hild from him was not established by the record.

Trial Court Opinion, 8/18/2022, at 4-5.

We agree with the trial court's decision to involuntarily terminate Father's rights under Section 2511(a)(1). Here, while the trial court focused on the six-month period preceding the filing of Mother's petition, it carefully considered Father's failure or refusal to perform parental duties in relation to the circumstances of the case. Here, there is no dispute that Father has not seen or contacted Child since 2017. Father has simply not carried out parental duties such as providing love, protection, guidance and/or support through affirmative actions such as communication and association to develop and maintain the parent-child relationship. The trial court considered Father's testimony regarding his learning disabilities and Father's argument that he relied extensively on family members to keep him informed. ***See id.*** at 4-5. Ultimately, however, the trial court determined that Father put forth "minimal effort" when his only action "was to ask Mother's brother and other people in his social circle if they could speak to Mother and ask permission for Father to resume having contact with Child." ***Id.*** at 5. The trial court also examined the purported barriers that prevented Father from maintaining the parent-child relationship. While Mother filed a PFA against Father which created a barrier for him, the trial court determined that Father did relatively

little to overcome that barrier. Moreover, we note that there is no dispute that Mother obtained a PFA against Father based upon his own conduct. **See** N.T., 7/22/2021, at 74 (Mother testified that she filed a PFA petition when Father "found out that [she] was messing with someone else [and Father] sent some guy to [her] house to shoot [her] house up" while she was at home with her children, but that the plan was later aborted). Such conduct is neither reasonably explained nor beyond Father's control. Father has simply failed to utilize all available resources to preserve the parental relationship and, instead, created his own impediments to having a relationship with Child. Accordingly, we conclude that the trial court did not abuse its discretion or err as a matter of law by involuntarily terminating Father's parental rights under Section 2511(a)(1).

Father's next two issues pertain to the trial court's application of 23 Pa.C.S.A. § 2511(b) and, therefore, we will examine them together. First, Father asserts that "[a]lthough [S]tepfather is willing to adopt [Child], the integrity of the proposed adoption is lacking[,]" and, therefore, the trial court erred by involuntarily terminating Father's parental rights pursuant to Section 2511(b). Father's Brief, at 28. Father avers that Stepfather has been married three times, including his current marriage to Mother, and has engaged in "adulterous affairs" and "open sexual relationships" in the past. **Id.** at 28-29. Father also contends that Mother and Stepfather began their relationship when Stepfather was still married to his second wife, there is a 36-year age difference between Mother and Stepfather, they "have little in common," and

it "appears [S]tepfather and [M]other entered into this marriage as an aid to" involuntarily terminate Father's parental rights. *Id.* at 30-31. In summation regarding the proposed adoption, Father argues:

> [The] trial court should be concerned with not only whether the adoption will occur, but whether the family unit will remain intact in the future. Stepfather's lack of respect for the sanctity of marriage and a strong proclivity to move from relationship to relationship calls into question the integrity of the proposed adoption. If [S]tepfather moves on from his current relationship with [M]other, like he has done with so many other relationships in the past, [Child] will be left without a father for a second time.

*Id.* at 30-31. In his third issue presented, Father claims the trial court erred as a matter of law or abused its discretion in generally applying Section 2511(b) because Mother failed to prove that severing the bond between Father and Child would not have a detrimental effect on Child. *Id.* at 32-36. Father argues that Child's preference was not considered and that the trial court failed to consider testimony from the court-appointed guardian *ad litem* who "did not believe that terminating [F]ather's parental rights would be in the best interests of the minor child." *Id.* at 36.[3]

This Court has previously determined:

> A petition to terminate a natural parent's parental rights, filed by one natural parent against the other under Section 2512(a)(1), is cognizable only if an adoption of the child is foreseeable. 23 Pa.C.S.A. § 2512(b); *In re Adoption of L.J.B.*, 18 A.3d 1098, 1107 (Pa. 2011); *see also In re B.E.*, 377 A.2d 153, 154 (Pa. 1977) (stating petition filed by one biological parent for involuntary termination of other biological parent's parental rights

---

[3] We note that neither the guardian *ad litem* nor Child's counsel filed a brief in this case.

can survive only "in connection with a plan for adoption"; affirming denial of biological mother's petition for involuntary termination of biological father's parental rights, even upon proof of natural father's abandonment of child, absent mother's plan to have child adopted by step-parent or any other person). Even when a Section 2512(a)(1) petition might satisfy the statutory requirements for termination, a court still cannot grant the petition without a corresponding plan for an anticipated adoption of the child. *In re Adoption of L.J.B.*, *supra* at 228, 18 A.3d at 1107. *See In re Adoption of J.F.*, 572 A.2d 223, 225 (Pa. Super. 1990) (construing language in subsection (b), albeit under a prior version, to mean that biological parent may not petition to terminate other biological parent's parental rights unless adoption is planned). A "contemplated adoption" is required in this context because Section 2512(a)(1) was not designed as a punitive measure to penalize an ineffective or negligent parent. *In re B.E.*, *supra* at 156.

*In re E.M.I.*, 57 A.3d 1278, 1285 (Pa. Super. 2012).

Involuntary termination under Section 2512(a)(1),

> is not to punish an ineffective or negligent parent, or provide a means for changing the surname of the child. Rather, the purpose of involuntary termination of parental rights is to dispense with the need for parental consent to an adoption when, by choice or neglect, a parent has failed to meet the continuing needs of the child.

Once a natural parent's rights are terminated, the concomitant adoption fosters a new parent-child relationship. Such a rule is sound because termination of the natural parent's rights prior to adoption and allowance of stepparent adoption is for purposes of protecting the integrity and stability of the new family unit.

*In re Adoption of L.J.B.*, 18 A.3d at 1107–1108 (Pa. 2011) (internal citations, quotations, original brackets, and footnotes omitted). "Strict compliance with the Adoption Act is a prerequisite to the court's jurisdiction to hear a petition to terminate parental rights in connection with a proposed

adoption." *In re E.M.I.*, 57 A.3d 1278, 1284–1285 (Pa. Super. 2012) (citation omitted).

Moreover,

[a]ssuming the termination pleading meets threshold requirements, the court proceeds with the two-part test for termination of parental rights under Section 2511 of the Adoption Act. *See* 23 Pa.C.S.A. § 2511. The initial focus is on the conduct of the parent whose rights are at issue.

*        *        *

The second prong of the test [under Section 2511(b)] centers on the needs and welfare of the child. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). "A proper Section 2511(b) analysis focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re T.D.*, 949 A.2d 910, 920 (Pa. Super. 2008), *appeal denied*, 970 A.2d 1148 (Pa. 2009). The court should examine intangibles such as "love, comfort, security, and stability" when determining the needs and welfare of the child. *Id.*

Current case law indicates that while an averment of a contemplated adoption might be sufficient to obtain a hearing on the termination petition, at the termination hearing the petitioning parent must demonstrate the planned adoption is also in the child's best interests, before the court will terminate the parental rights of the responding parent. *See In re Adoption of L.J.B.*, *supra* at 1110–1111 (implying no gain to child or society is achieved by terminating one parent's rights to permit adoption by another who is unwilling or unqualified to adopt). Thus, as part of its Section 2511(b) analysis of the needs and welfare of the child in this context, the court must address and evaluate the "proposed adoption" that was averred in the termination petition. *See generally id*.

*Id.* at 1287 (brackets added).

"In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond

analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted). "When conducting a bonding analysis, the court is not required to use expert testimony. [Instead, s]ocial workers and caseworkers can offer evaluations as well." *In re Z.P.*, 994 A.2d at 1121. Further,

> in addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with [an adoptive] parent.

*In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010). "Above all else . . . adequate consideration must be given to the needs and welfare of the child. A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." *In re Z.P.*, 994 A.2d at 1121 (quotation marks and citations omitted).

"We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence." *In re Adoption of R.J.S.*, 901 A.2d 502, 506 (Pa. Super. 2006) (citation omitted). "The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony." *Id.* (citations omitted). "In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence." *Id.* (citation omitted).

On Father's two issues related to Section 2511(b), the trial court found:

> []Father [contends] that the proposed adoption of [Child] would be suspect[.] Father points to Stepfather's history of courting younger women but not maintaining a longstanding relationship with them before ending the relationship in pursuit of another. Even if the [c]ourt did agree that Stepfather's relationship history suggests what Father contends, the [c]ourt cannot speculate as to how long the current marriage between Mother and Stepfather will last. According to the testimony presented, the parties intend to form an intact family, and the [c]ourt judged this testimony to be credible. […] In this matter, the [c]ourt found the evidence regarding the legitimacy of the intentions of Mother and Stepfather to move forward with the adoption process for [] Child to be credible.
>
> Father's second point is also unpersuasive, in that Mother was able to establish that [] Child and Father have not had significant contact since prior to the filing of the PFA [petition] in 2018. Regardless of the reasons Father espoused for not pursuing a relationship with [] Child, the fact remains that for over four years, [] Child did not participate in building and maintaining a parent-child bond with Father. To say that would be detrimental to sever such bond would imply that one exists at all. Possibly the strongest evidence of this fact is that [] when [] the paternal grandmother to [] Child [] passed away in between scheduled hearing dates, Mother testified that she had asked [] Child if he wished to attend [her funeral], and he declined to do so. [] Child did not express any desire to contact Father or even any concern for Father's emotional well-being following the passing of the paternal grandmother. As such, the [c]ourt found that no beneficial bond exists between [] Child and Father.

Trial Court Opinion, 8/18/2022, at 6.

Upon our review of the certified record and applicable law, we discern no trial court abuse of discretion or error of law in involuntarily terminating Father's parental rights under Section 2511(b). Mother and Stepfather testified at length about their intent for Stepfather to adopt Child. The trial court found this testimony credible and in Child's best interest, and we will not usurp those determinations. While Father suggests that the trial court should

have examined whether the family unit will remain intact in the future, the court was only required to address and evaluate the proposed adoption and the best interest of Child, which it did. Furthermore, as the trial court noted, it would be mere speculation to guess how long the current marriage between Mother and Stepfather will last. Additionally, there was no evidence of any bond between Father and Child and, therefore, it was reasonable for the trial court to infer that no bond exists. Whereas, in contrast, there was evidence that Stepfather provides financial, educational and emotional support for Child and that they are bonded. Father's own feelings of love and affection for Child, alone, do not prevent termination of his parental rights. Accordingly, Father's last two appellate issues lack merit. For all of the foregoing reasons, it was proper for the trial court to involuntarily terminate Father's parental rights to Child pursuant to 23 Pa.C.S.A. §§ 2511(a)(1) and 2511(b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/27/2023